## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Gregory Whaley,                    :        Case No. 1:13CV2684

     Plaintiff,                    :

vs.                                :

                                   :        **MEMORANDUM AND**
Carolyn W. Colvin,                 :        **ORDER**
Acting Commissioner of the Social Security
Administration                     :

     Defendant.                    :

Plaintiff seeks judicial review of a final decision of the Commissioner denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI, respectively, of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* and 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos. 15 & 16).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

### I.  PROCEDURAL BACKGROUND

On June 28, 2012, Plaintiff filed for SSI and DIB, alleging disability beginning June 12, 2012 (Docket No 11, pp. 165-175; 176-185 of 568).  Plaintiff's claims were denied initially on September 10, 2012, and upon reconsideration on January 10, 2013 (Docket No. 11, pp. 97-99; 100-102; 110-112; 117-118 of 568).  Plaintiff filed a written request for a hearing on January 17, 2013 (Docket No. 11, p. 123 of 568).  On July 10, 2013, Administrative Law Judge (ALJ) Peter Beekman presided over an administrative  hearing in Cleveland, Ohio, at which Plaintiff, represented by counsel Marcia Margolius,  appeared and testified.  Vocational Expert (VE) Dr.

James Zolder, also testified (Docket No. 11, p. 35 of 568).  The ALJ issued an unfavorable decision on August

30, 2013 (Docket No.11, pp. 15-27 of 568).  The Appeals Council denied review of the ALJ's decision on October

25, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, p. 5 of 568).

## II. FACTUAL BACKGROUND

A.   ADMINISTRATIVE HEARING

1.   PLAINTIFF'S TESTIMONY

Plaintiff testified that  he was 49 years old and has had diabetes since 1975, which began to  worsen during

approximately 1980 (Docket No. 11, pp. 36-37 of 568).  Plaintiff is a high school graduate,  and he described his

past employment as a corrections officer, security guard, dietary aide and cook, and work at a metal fabrication

firm (Docket No. 11, p. 36 of 568).   When asked about his health, Plaintiff noted that his diabetes was

uncontrolled and that he has kidney problems (Docket No. 11, pp. 36; 43 of 568).  Despite having previously been

able to work, Plaintiff testified that his diabetes now causes him to pass out and collapse and that he has issues

standing due to swelling, blistering, and infections in his feet (Docket No. 11, pp. 36-37 of 568).  He testified that

in the past, he was  able to stand for two hours, but now is limited to about an hour and a half due to sharp and

excruciating pain which shoots up and down his legs and into his feet (Docket 11, pp. 36-37 of 568).   Plaintiff

noted that walking causes his feet to swell, blister and bleed, but that he is able to walk approximately four blocks,

including to the store and library, but has difficulty with stairs (Docket No. 11, p. 38; 40; 44 of 568).   Plaintiff

does not drive a car (Docket No. 11, p. 44 of 568).

In addition to problems with his feet, Plaintiff also indicated that he suffers from numbness in his hands

which causes him difficulty buttoning his shirt and drawing (Docket No. 11, pp. 36; 38; 43 of 568).  Plaintiff

described a typical day to include going to the library, when he is able, cleaning the apartment, taking care of his

personal hygiene,  monitoring his blood sugar, drawing and reading (Docket No. 11, p. 39 of 568).  Depending

upon his blood sugar levels, Plaintiff testified  that his vision goes blurry, and he experiences  tingling in his feet

that he compared to a feeling of having electricity in his veins (Docket No. 11, pp. 44-45 of 568).  Plaintiff also noted that when he wakes up in the morning, he experiences pain all over his body (Docket No. 11, p. 43of 568).

In response to the ALJ's questions, Plaintiff testified that he checks his blood sugar four-to-five, maybe even ten times a day, provided he has the testing equipment to do so (Docket No. 11, p. 38 of 568).  Plaintiff uses insulin, but was unable to recall his last hemoglobin A1c reading (Docket No. 11, p. 38 of 568).  Based upon the records before the ALJ and the assistance of  Plaintiff's attorney, it was determined that Plaintiff's hemoglobin A1c  reading was nine in February, which increased from eight in August 2012 (Docket No. 11, p. 39 of 568).  When asked about his diet, Plaintiff explained that he does the best he can to count carbohydrates because if he fails to do so he "bottoms out" (Docket No. 11, p. 39 of 568).  Plaintiff also described how he takes his insulin adjusting the number of units  based upon his sugar levels after eating (Docket No. 11, p. 40 of 568).  The ALJ asked Plaintiff about  Dr. Singh's note that he was not taking his medications in April 2013, and Plaintiff responded that he did not have the money to get blood sugar strips (Docket No. 11, p. 41 of 568).  Despite sleep apnea, Plaintiff testified that he does not use a continuous positive airway pressure (CPAP)[1] machine and stated that he had been hospitalized once duringr the previous year (Docket No. 11, p. 40 of 568).

During questioning from his attorney, Plaintiff indicated that he has been rated by and treats with MetroHealth Systems (Docket No. 11, pp. 42; 44 of 568).  According to Plaintiff, "Metro" has  provided him testing strips since March or April (Docket No. 11, p. 42 of 568)  Plaintiff receives food stamps, but no other financial assistance (Docket No. 11, p. 42 of 568).  As a result, Plaintiff explained that he does not always eat and has to miss eating certain meals because his food stamps typically run out during the last week of the month until the ninth  of  the  following  month  when  they  are  replenished  (Docket No. 11, p. 42 of 568).   Under the

---

[1]  A CPAP machine is used to help a person with obstructive sleep apnea breathe more easily while sleeping by increasing the air pressure in the person's throat so that their airway does not collapse while the person breathes in.  *Continuous Positive Airway Pressure (CPAP) Therapy for Obstructive Sleep Apnea*, WEBMD, (Aug. 4, 2014, 11:34 AM), http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea.

circumstances, Plaintiff explained that he follows his diet to the best of his ability to do so(Docket No. 11, p. 42 of 568).

### 2.    VE TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background before the hearing, the VE described Plaintiff's past work as: cook, DOT[2] 315.361-010, which is medium work with a specific vocational preparation (SVP)[3] of 6, and skilled; police officer II, DOT 375.367-010, light work with a SVP of 5, semi-skilled; hospital food service worker, DOT 319.677-014, medium work with a SVP of 2, unskilled; security guard, DOT 372.667-034, light work with a SVP of 3, semi-skilled; and metal fabricating shop helper, DOT 619.687-022, heavy work with a SVP of 2 and unskilled (Docket No. 11, pp. 46-47 of 568).  The VE testified that there are transferrable skills from Plaintiff's work as a cook, police officer II, and security guard, including written instructions, following spoken instructions, preparing food for customers,  filing documents, managing and directing people and programs, negotiating staff policies and disputes, and working as a member of a team (Docket No. 11, pp. 47; 49 of 568).

Next the ALJ indicated he would pose two hypothetical questions to the VE and indicated that for each hypothetical the ALJ wanted the VE to answer whether the hypothetical person would be capable of performing any or all of Plaintiff's past work and if not, whether there would be any jobs in significant numbers in the national or regional economy that the hypothetical person would be capable of performing.  The ALJ then described the hypothetical individual and asked his first hypothetical question:

"This person is male, 49 years of age, high school education, same work background as [Plaintiff].

---

[2]  Dictionary of Occupational Titles ("DOT")

[3]  SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

The first hypothetical person can lift, carry 20 pounds occasionally, 10 pounds frequently.  Can stand, walk four out of eight hours a day, one hour at a time; can sit six out of eight hours a day; push/pull is frequent; foot pedal is frequent; occasionally use a ramp or stairs but never a ladder, rope or a scaffold; can constantly balance; frequently stoop, kneel, crouch, and crawl.  Manipulative capabilities are all frequent as opposed to constant.  Visual capabilities are all frequent.  Communication skills, hearing and speaking are both constant.  Finally, this person should avoid dangerous machinery and unprotected heights.

(Docket No. 11, pp. 49-50 of 568).  Taking into account these limitations, the VE testified that such an individual would be able to perform the work as a police officer II and security guard (Docket No. 11, p. 50 of 568).  The ALJ followed up by inquiring of the VE, whether there would be any other jobs that the hypothetical individual could perform assuming no past work (Docket No. 11, p. 50 of 568).  The VE provided the jobs of office helper, DOT 239.567-010, considered light work with a SVP of 2, unskilled, and having 83,300 full-time jobs in the national economy and 2,500 in Ohio; mail clerk, DOT 209.687-026, light work with a SVP of 2, unskilled, and having 17,900 full-time jobs in the national economy and 800 in Ohio; cashier II, DOT 211.462-010, light work with a SVP of 2, unskilled, and having 821,000 full-time jobs in the national economy and 30,000 in Ohio (Docket No. 11, pp. 50-51 of 568).

The ALJ then proceeded to ask his second hypothetical question:

Now, a second hypothetical, the only difference between the two hypotheticals is going to be the lift/carry and that would be 10 pounds occasionally, up to 10 pounds frequently.  All the rest is the same.

(Docket No. 11, p. 51 of 568).  After considering the limitations, the VE explained that all relevant past work would be precluded, but that there would be other work that would fit the hypothetical (Docket No. 11, p. 51 of 568).  The VE then offered the following jobs of surveillance system monitor, DOT 379.367-010, sedentary work, with a SVP of 2, unskilled, and having 74,500 full-time jobs in the national economy and 2000 in Ohio; food and beverage order clerk, DOT 209.567.014, sedentary work with a SVP of 2, unskilled, and with 215,400 full-time jobs in the national economy and 8,700 jobs in Ohio; table worker, DOT 739.687-182, sedentary work with a SVP of 2, unskilled, and having 21,000 full-time jobs in the national economy and 1,000 in Ohio (Docket No. 11, pp.

5

51-52 of 568).

During questioning from Plaintiff's counsel, the VE was asked to return to hypothetical number two and assume limitations for occasional use of upper extremities for reaching, pushing, pulling, and fine and gross manipulations and asked whether the hypothetical individual could still perform the sedentary jobs the VE identified (Docket No. 11, p. 52 of 568). The VE responded, noting only the work as surveillance system monitor would remain (Docket No. 11, p. 52 of 568). Counsel for Plaintiff asked the VE if there would be any other sedentary jobs that the hypothetical individual would be able to perform (Docket No. 11, p. 52 of 568). The VE identified the jobs of call out operator, DOT 237.367-014, sedentary work with a SVP of 2 and election clerk, DOT 205.367-030, sedentary work with a SVP of 2, which is unskilled (Docket No. 11, pp. 52-53 of 568). Both of those positions, according to the VE, are full time positions (Docket No. 11, p. 53 of 568).

Once again, counsel for Plaintiff invited the VE to return to hypothetical number two, but asked the VE to ignore the limitations for occasional push/pull, fine and gross manipulation and to instead consider a limitation that the hypothetical individual is going to be off task 20 percent of the time due to diabetic related symptoms and asked whether any of the sedentary jobs would still remain (Docket No. 11, p. 53 of 568). The VE replied answering that none of the sedentary or light jobs discussed in either hypothetical one or two would remain (Docket No. 11, pp. 53-54 of 568).

**B.    MEDICAL RECORDS**

Summaries of Plaintiff's medical records, to the extent that hey are necessary and relevant to the issues before this Court, follow.

### 1.    OFFICE TREATMENT RECORDS- METROHEALTH SYSTEM - DR. PAYAL AHUJA, M.D.

- On May 8, 2012, Plaintiff was examined as a new patient to establish a treating relationship. It was noted that Plaintiff had recently been admitted to the hospital for hyperglycemia, had a blood glucose range of 180 to 355, and uses regular insulin. Plaintiff complained of leg swelling and ulcers. Plaintiff's past medical history indicates Plaintiff has suffered from diabetes mellitus since

6

age 12, hypertension,[4] and hyperlidemia.[5]  Dr. Ahuja ordered blood, urine and metabolic panel testing and  prescribed Plaintiff lisinopril[6] for his hypertension and maintained him on Zocor[7] for hyperlipidemia (Docket No. 11, pp. 324-329 of 568).  Plaintiff's urine analysis noted high levels of micro-ablumin/creatinine ratio,[8] in his urine while his basic metabolic panel reflected high levels of glucose, blood urea nitrogen (BUN),[9] creatinine, and low levels of sodium, and for his estimated glomerular filtration rate (GFR)[10] (Docket No. 11, p. 330 of 568).

- On June 13, 2012, Plaintiff presented himself for a follow-up on his hypertension and diabetes. Teaching Physician Dr. Antoniette Abou Haidar's, M.D. examination notes reflect that Plaintiff had started new employment within the past week which required him to stand on his feet for eight hours a day causing him to develop blisters on both legs.  Plaintiff also reported higher blood sugar readings for the past week between 200 and 300.  Plaintiff was prescribed a bactrim course and Lasix[11] 20 mg, three times a day for his edema (Docket No. 11, pp. 306-309 of 568).  The record

---

[4]  Hypertension is the medical term used to describe high blood pressure. *High blood pressure (hypertension) Definition*, MAYO CLINIC, (July 24, 2014, 9:02 AM), http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/con-20019580.

[5]  Hyperlipidemia is a term used to describe high cholesterol and high triglycerides. *Hyperlipidemia*, AM. HEART ASSOC., (July 24, 2014, 8:59 AM), http://www.heart.org/HEARTORG/Conditions/Cholesterol/AboutCholesterol/Hyperlipidemia_UCM_434965_Article.jsp.

[6]  Lisinopril is prescribed to treat hypertension.  *Lisinopril oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 24, 2014, 8:39 AM), http://www.webmd.com/drugs/drug-6873-Lisinopril+Oral.aspx?drugid=6873&drugname=Lisinopril+Oral.

[7]  Zocor is prescribed for use along with a proper diet, to help lower bad cholesterol. *Zocor oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 24, 2014, 8:41 AM), http://www.webmd.com/drugs/drug-6040-Zocor+Oral.aspx?drugid=6040&drugname=Zocor+Oral.

[8]  The micro-ablumin/creatinine ratio is used to diagnose and monitor kidney damage in patient with diabetes.  *See Urine Albumin-to-Creatinine Ratio (UACR)*, NAT. KIDNEY DISEASE EDUCATION PROGRAM, (July 23, 2014, 4:54 PM), http://nkdep.nih.gov/resources/quick-reference-uacr-gfr-508.pdf.

[9]  BUN test results show information about kidney and liver functioning by measuring the amount of urea nitrogen in a patient's blood.  *Blood urea nitrogen (BUN) test definition*, MAYO CLINIC, (July 24, 2014, 8:44 AM), http://www.mayoclinic.org/tests-procedures/blood-urea-nitrogen/basics/definition/prc-20020239.

[10]  A GFR tests kidney functioning by providing an estimate of how much blood passes through the glomerui, which are tiny filters in the kidneys that filter waste from the blood. *Glomerular filtration rate*, MEDLINEPLUS, (July 23, 2014, 4:48 PM), http://www.nlm.nih.gov/medlineplus/ency/article/007305.htm.

[11]  Lasix is a brand name for the drug furosemide.  Lasix (Furosemide) *Drug Information: Description, User Reviews, Drug Side Effects, Interactions*, RXLIST, (August 4, 2014, 8:48 AM), http://www.rxlist.com/lasix-drug.htm. Furosemide is used to reduce swelling and fluid retention caused by a variety of medical issues including heart or liver disease and can be used to treat high blood pressure. *Furosemide: MedlinePlus Drug Information*, MEDLINEPLUS, (July 24, 2014, 9:15 AM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html.

also includes a letter from Dr. Ahuja on June 13, 2012, which notes that Plaintiff cannot stand for more than two hours without aggravating an unidentified problem (Docket No. 11, p. 301 of 568). The results of Plaintiff's basic metabolic panel reported low glucose and GFR levels, and high carbon dioxide and creatinine levels in Plaintiff's blood (Docket No. 11, p. 310 of 568). A complete blood count with differentiation noted low hemoglobin[12] (Docket No. 11, p. 311 of 568).

- On July 27, 2012, Plaintiff's leg blister was examined. It was noted that the blister had been draining for a few days, was not painful and Plaintiff's blood glucose was listed as well controlled. Plaintiff's assessment reflects he was diagnosed with cellulitis and prescribed sulfamethoxazole-trimethoprim,[13] and furosemide[14] for leg swelling. (Docket No. 11, pp. 399-401 of 568).

- On August 20, 2012, Plaintiff was examined for a follow-up on his diabetes and reported mostly low blood glucose in the morning and high blood glucose in the 500s at bedtime. Plaintiff's diabetic foot ulcer was described as doing better. Plaintiff's regular insulin regimen was discontinued and he was started on Lispro 5[15] with meals (Docket No. 11, pp. 367-369 of 568). Plaintiff was also examined by Teaching Physician Dr. Ifelorunbode A. Adebambo, M.D., who described his diabetes mellitus as poorly controlled (Docket No. 11, pp. 370-371 of 568). The results of Plaintiff's basic metabolic panel noted high levels of creatinine and low levels of estimated GFR (Docket No. 11, pp. 393-394 of 568). Plaintiff's hemoglobin A1c was also flagged as high (Docket No. 11, p. 394 of 568).

- On November 2, 2012, Plaintiff had a follow-up examination on his diabetes. Once again, Plaintiff's diabetes was described as uncontrolled. Plaintiff reported having been out of his medication for a week, and indicated his blood glucose levels had been as high as 500 and as low as 59. Plaintiff's hypertension was also described as uncontrolled and he was prescribed amlodipine[16] and lisinopril for his hypertension and Zocor for his hyperlipidemia (Docket No. 11, pp. 381-384 of 568).

---

[12] Hemoglobin is the protein in a patients red blood cells that carries oxygen. *Low hemoglobin count Definition*, MAYO CLINIC, (July 24, 2014, 9:04 AM), http://www.mayoclinic.org/symptoms/low-hemoglobin/basics/definition/sym-20050760.

[13] Sulfamethoxazole and trimethoprim are a combination of medications used to treat infections. *Sulfamethoxazole/Trimethoprim*, MAYO CLINIC, (July 24, 2014, 9:08 AM), http://www.mayoclinic.org/drugs-supplements/sulfamethoxazole-trimethoprim-oral-route/description/drg-20071899.

[14] Furosemide is used to reduce swelling and fluid retention caused by a variety of medical issues including heart or liver disease and can be used to treat high blood pressure. *Furosemide: MedlinePlus Drug Information*, MEDLINEPLUS, (July 24, 2014, 9:15 AM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html.

[15] Lispro 5 is a type of insulin. *See Diabetes Drugs*, HEALTHLINE, (July 24, 2014, 9:18 AM), http://www.healthline.com/health/diabetes-drugs.

[16] Amlodipine is prescribed to treat high blood pressure and chest pain. *Amlodipine: MedlinePlus Drug Information*, MEDLINEPLUS, (July 24, 2014, 9:12 AM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html.

- On February 11, 2013, presented himself for a follow-up concerning his diabetes. Plaintiff reported that he had not been taking his diabetes medications for approximately one month due to financial difficulties, and was not eating consistent meals because his food stamps run out. Plaintiff complained of right sided weakness when hypoglycemic, which he indicated improves with drinking and eating. Dr. Anuja recommended restarting Plaintiff's medications (Docket No. 11, pp. 496-502 of 568). Dr. Adebambo's notes reflect that Plaintiff was advised to try to obtain medications with his new insurance because they should cover his medications and that Plaintiff was educated about food banks and food kitchens (Docket No. 11, p. 501 of 568).

## 2. EMERGENCY DEPARTMENT-METROHEALTH SYSTEM

- On April 28, 2012, Plaintiff complained of chest symptoms and further that his chest hurts when coughing, feeling weak. Plaintiff was evaluated by Dr. Jonathon E. Sliff, M.D. who noted Plaintiff's glucose level was 362. Plaintiff's chest x-ray revealed no acute disease. Plaintiff was assessed as having hyperglycemia due to poorly controlled diabetes and discharged on May 1, 2012 (Docket No. 11, pp. 338-356; 449-453 of 568).

- On January 6, 2013, Plaintiff complained of having a hypoglycemic episode at church after taking insulin, but forgetting to eat. Attending physician Dr. David Effron, M.D. evaluated Plaintiff and he was discharged after his symptoms stabilized (Docket No. 11, pp. 464-474 of 568).

- On April 12, 2013, Plaintiff complained of a right arm bug bite, erythema and nausea. Plaintiff was evaluated by Jason Lu, a certified nurse practitioner (CNP), who noted right arm cellulitis and nausea among Plaintiff's diagnoses and prescribed him doxycycline,[17] diphenhydramine-zinc acetate,[18] and ondansetron[19] (Docket No. 11, pp. 487-491; 505-513 of 568).

## 3. OFFICE TREATMENT RECORDS-METROHEALTH SYSTEM

- On April 30, 2012, Plaintiff underwent a sleep study. His neck circumference was measured as well as his weight, height and body mass index (BMI). Dr. Dennis Auckley, M.D. diagnosed Plaintiff with obstructive sleep apnea with infrequent mild associated hypoxia[20] (Docket No. 11,

---

[17] Doxcycline is used to treat bacterial infections. *Doxycycline: MedlinePlus Drug Information,* MEDLINEPLUS, (Aug. 4, 2014, 9:16 AM), http://www nlm nih.gov/medlineplus/druginfo/meds/a682063 html.

[18] Diphenhydramine-zinc acetate diphenhydramine-zinc acetate is used to relieve itching and pain caused by skin irritation. *diphenhydramine-zinc acetate topical: Uses, Side Effects, Interactions, Pictures Warnings & Dosing,* WEBMD, (Aug. 4, 2014, 9:14 AM), http://www.webmd.com/drugs/drug-4462-diphenhydramine-zinc+acetate+top.aspx?drugid=4462&drugname=diphenhydramine-zinc+acetate+top.

[19] Ondansetron is used to prevent nausea and vomiting. *Ondansetron oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing,* WEBMD, (Aug. 4, 2014, 9:19 AM), http://www.webmd.com/drugs/mono-8296-ondansetron+disintegrating+tablet+-+oral.aspx?drugid=16910&drugname=ondansetron+oral.

[20] Hypoxia are episodes of low blood oxygen. *Sleep apnea Complications - Diseases and Conditions,* MAYO CLINIC, (Aug. 4, 2014, 9:22 AM), http://www mayoclinic.org/diseases-conditions/sleep-apnea/

pp. 332-334 of 568).

- On May 23, 2012, Plaintiff consulted with Vicki Laganke, RD,[21] for a nutrition assessment. Plaintiff's nutrition diagnosis notes inconsistent carbohydrate intake related to snacking and food and nutrition-related knowledge deficit.  Plaintiff was advised about carbohydrate (CHO) counting, CHO rationale, foods with CHO, and portions.  Plaintiff was instructed to keep a food record with the amount of CHO per meal, and work to get more consistent at meals, including having three meals per day (Docket No. 11, pp. 320-322 of 568).

- On June 5, 2012, Plaintiff presented himself to Lucinda Newshutz, BSN,[22] for assistance with maintaining his diabetes.  Plaintiff was instructed to begin taking regular insulin 30 minutes before his meals and to follow-up in diabetes class (Docket No. 11, pp. 313-317 of 568).

- On July 31, 2012, Plaintiff had a consultation with Dr. Michael J. Bodman, DPM,[23] for a grade two pressure ulcer on his left foot.  Plaintiff was instructed to apply topical antibiotic ointment, to keep the wound clean and dry, and dressed (Docket No. 11, p. 362 of 568).

- On February 6, 2013, Plaintiff consulted with Physical Therapist Raymond A. Lumpkin, for a functional capacity evaluation.  Plaintiff reported severe bilateral foot pain with prolonged activity and heavy lifting.  Plaintiff's listing assessment indicates he can occasionally lift 65 pounds and frequently lift 30 pounds (Docket No. 11, p. 492 of 568).

- On April 25, 2013, Plaintiff was seen by Dr. Singh Tanvir, M.D., for a follow-up examination concerning his diabetes, hypertension, and hyperlipidemia.  Plaintiff reported that he had not been taking all of his medications consistently and not been checking his blood sugar.  Plaintiff also requested that Dr. Tanvir fill out a disability form.  On examination, Plaintiff's physical exam noted no abnormalities. Plaintiff's foot exam detailed no trophic changes or ulcerative lesions.  Dr. Tanvir ordered a full lipid profile and hepatic function panel, and provided Plaintiff with some test strips.  Plaintiff's diagnoses included chronic kidney disease and Dr. Tanvir increased Plaintiff's dosage of lisinopril, advised him to take better control of his diabetes and hypertension, and maintained him on Norvasc.[24]  Teaching Physician Dr. Rumilia Tolentino, M.D., who also examined Plaintiff commented in his notes that Plaintiff does not have qualifications for disability (Docket No. 11, pp. 544-550 of 568).

---

basics/complications/con-20020286.

[21]  Registered Dietitian (RD)

[22]  Bachelor of Science in Nursing (BSN)

[23]  Doctor of Podiatric Medicine (DPM)

[24]  Norvasc is a brand name for the drug amlodipine and is used to treat high blood pressure. *Norvasc oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Aug. 4, 2014, 9:33 AM), http://www.webmd.com/drugs/drug-5942-norvasc+oral.aspx.

- On June 3, 2013, Plaintiff was seen by Eileen Fisher, CNP, for a blood pressure check, lab review and medication adjustment.  Plaintiff reported no complaints, had not seen a nephrologist, and did not understand chronic kidney disease.  Plaintiff's blood pressure was listed at 136/78.  His labs noted high levels of creatinine, and low levels of estimated GFR, and glucose.  Ms. Fisher's impression noted Plaintiff's blood pressure was near goal of 130/80 and that his kidney function was stable.  Plaintiff was advised to follow up with Dr. Madhaven, about chronic kidney disease, and to avoid foods high in salt (Docket 11, pp. 563-566; 568 of 568).

### 4.  OFFICE TREATMENT RECORDS-METROHEALTH SYSTEM- DR. PAHLAJANI, M.D.

On May 22, 2013, Plaintiff sought a follow-up for his diabetes and refills of his medication.  Plaintiff reported his glucose at home is between 50 and 400 and indicated his low sugars are the result of not having food to eat, but that he continues to take his insulin.  He denied hypoglycemia symptoms.  Dr. Pahlajani's notes reflect Plaintiff had an elevated blood pressure, takes his medications infrequently because he forgets and at time does not refill his prescriptions.  On the day of this examination it was noted that Plaintiff had not taken his medications.  No abnormalities were described during Plaintiff's physical examination and his foot exam reflected no trophic changes or ulcerative lesions.  A full lipid profile was ordered and Plaintiff was started on Neurontin.  Ophthalmology, kidney,  bladder and renal services were ordered (Docket No. 11, pp. 553-559 of 568).  The results of the kidney and bladder testing noted that  Plaintiff's left kidney function was unremarkable and an increase in the echotexture of the right renal parenchyma[25] suggested medical renal disease (Docket No. 11, p. 561 of 568).

### a.  MEDICAL SOURCE STATEMENT- PHYSICAL CAPACITY- DR. GEETH PAULAJANI, M.D.

On May 22, 2013, Dr. Paulajani completed a medical source statement concerning Plaintiff's physical capabilities for work activity.  Dr. Paulajani's assessment reflects that Plaintiff's diabetic neuropathy affects his abilities to lift, carry, stand, and walk, limiting Plaintiff to lifting and carrying no more than one-to-two pounds

---

[25] Parenchyma is the essential and distinctive tissue of an organ or an abnormal growth as distinguished from its supportive framework. *Parenchyma - Definition*, MERRIAM-WEBSTER, (July 28, 2014, 10:15 AM), http://www.merriam-webster.com/dictionary/parenchyma.

occasionally, and standing and walking no more than four-to-five hours during a normal workday, but no more than one hour without interruption.  Dr. Paulajani opined that Plaintiff has no limitations for sitting.  The assessment reflects that Plaintiff is also limited by his diabetic neuropathy to occasionally performing the postural activities of climbing, balancing, stooping, crouching, kneeling, crawling, reaching, pushing, pulling, fine manipulation, and gross manipulation.  Plaintiff was assessed environmental restrictions for heights, moving machinery, temperature extremes, and pulmonary irritants, but no restriction for noise.  By way of checkmarks on the medical source form, Dr. Paulajani indicated that Plaintiff experiences moderate pain, which results in Plaintiff being off task and causing absenteeism.  The assessment also notes that Plaintiff needs to have the ability to elevate his legs 45 degrees at will and does not otherwise include any additional comments or explanation for the assessment (Docket No. 11, pp. 526-527 of 568).

## C.    STATE AGENCY PHYSICAL RESIDUAL FUNCTIONAL CAPACITY (RFC) DETERMINATIONS

### 1.    DR. LYNNE TORELLO, M.D.

On September 2, 2012, Dr. Torello completed a nonexamining physical RFC assessment for the agency's initial consideration of Plaintiff's applications for DIB and SSI.  Dr. Torello assessed Plaintiff's exertional limitations, opining that he can lift and carry 20 pounds occasionally and 10 pounds frequently.  She also determined that Plaintiff could stand, walk, and sit for a total of about six hours in an eight-hour workday.  Plaintiff was assessed no limitations for pushing or pulling except for those assessed for lifting or carrying.  The assessment notes no other postural, manipulative, visual, communicative, or environmental limitations (Docket No. 11, pp. 59-60; 67-68 of 568).

### 2.    DR. LESLIE GREEN, M.D.

On January 9, 2013, Dr. Green completed a nonexamining physical RFC assessment as part of the reconsideration of Plaintiff's applications for DIB and SSI.  Dr. Green assessed Plaintiff the same exertional

limitations as detailed by Dr. Torello, indicating Plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, is able to stand, walk, and sit for six hours of an eight-hour work day, and has unlimited ability to push and pull except for the limitations assessed for lifting and carrying.  Dr. Green differed from Dr. Torello, however; in assessing Plaintiff's postural limitations, opining Plaintiff could climb ramps and stairs frequently, but could never climb ladders, ropes, and scaffolds, could frequently balance.  The rationale provided by Dr. Green for the postural limitations was Plaintiff's dizziness.  Plaintiff was not assessed any manipulative, visual, or communicative limitations, but was assessed environmental limitations to avoid all exposure to hazards such as machinery or heights due to dizziness (Docket No. 11, pp. 79-80; 90-91 of 568).

### III. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014).  At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 416.945(a) (West 2014).  In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. §

416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 0 C.F.R. § 416.920(e) (West 2014).  Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b),  416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  While the claimant has the burden of proof in steps one through four.  The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

## IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Beekman made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

14

2.      Plaintiff has not engaged in substantial gainful activity since June 12, 2012, the alleged onset date.

3.      Plaintiff has the following severe impairments: insulin dependent diabetes mellitus, hypertensive cardiovascular disease, obstructive sleep apnea and high blood pressure.

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, ALJ Beekman found that Plaintiff has the residual functional capacity (RFC) to perform the following: lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk four hours a day and one hour at a time and sit six hours of an eight-hour workday, can frequently push/pull and use foot pedals, can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds, can constantly balance, frequently stoop, kneel, crouch and crawl, manipulative and visual capabilities are all frequent, communication skills (hearing and speaking) are constant, must avoid dangerous machinery and unprotected heights.

6.      Plaintiff is capable of performing past relevant work as a security guard and police officer.  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7.      Plaintiff has not been under a disability, as defined in the Act, from June 12, 2012, through the date of the decision.

(Docket No. 11, pp. 18-27 of 568).

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)).  "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance."  *Miller*,

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and asserts two assignments of error.  First, Plaintiff alleges the ALJ erred by failing to give the opinion of Dr. Payal Ahuja, his treating physician, proper weight in his analysis.  Plaintiff argues: (1) the ALJ's rationale for affording Dr. Ahuja less than "controlling weight" is insufficient; and (2) Dr. Ahuja's findings are supported by ample evidence in the record (Docket No. 15, pp. 7-11 of 15).  Plaintiff's second assignment of error alleges the ALJ's finding that Plaintiff could perform light work is not supported by substantial evidence.  Instead, Plaintiff contends that at best, he is able to perform sedentary work with restrictions that under the medical vocational guidelines would result in a disability finding (Docket No. 15, pp. 11-13 of 15).

### B.  DEFENDANT'S RESPONSE

Defendant disagrees and contends that the ALJ's decision is supported by substantial evidence.  In response to Plaintiff's first assignment of error, Defendant argues that the ALJ's decision to afford Dr. Ahuja's opinion "some weight" was appropriate given Dr. Ahuja had only treated Plaintiff for one-month at the time she rendered her opinion concerning a standing limitation, which is not otherwise supported by any reasons in her letter, and inconsistent with the objective medical evidence (Docket No. 16, pp. 9-12 of 15).  With respect to

16

Plaintiff's second assignment of error, Defendant argues that there is substantial evidence to support the ALJ's finding that Plaintiff has retained the ability to perform a limited range of light work and contends that the evidence Plaintiff relies upon in his argument was appropriately discounted and otherwise inconsistent with the record (Docket No. 16, pp. 12-13 of 15).

## C.   ANALYSIS

### 1.   THE TREATING PHYSICIAN RULE

Federal regulations prescribe certain standards an ALJ must comply with in assessing the medical evidence contained in the record.  The treating physician rule is one such standard and requires that a treating physician's assessment be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004); *Blakley*, 581 F.3d at 406; *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996)("Controlling weight may not be given to a treating source's opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.").  This rule stems from the belief that a claimant's treating physicians are best positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide a unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

An ALJ may not reject or discount a treating physician's opinion without providing "good reason" for doing so in their decision to make it sufficiently clear to "subsequent reviewers the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (citing SSR 96-2P, 1996 WL 374188, *5). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not,

17

unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citation omitted). To comply with the obligation to provide good reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Commissioner*, 2013 WL 5437046, *3 (N.D.Ohio 2013) (citing *Wilson*, 378 F. 3d at 546). The factors set forth in both § 404.1527(d)(2) and § 416.927(c)(2), require the ALJ to consider the length, frequency, nature and extent of the treatment relationship, the evidence the medical source presents to support their opinion, the consistency of the opinion with the record as a whole, the specialization of the opinion, and any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2) (West 2014).

### a. DID THE ALJ PROPERLY WEIGH DR. AHUJA'S OPINION

After summarizing Dr. Ahuja's letter dated June 13, 2012, which included a limitation that Plaintiff should not stand for long periods of time and no more than two hours, ALJ Beekman explained giving Dr. Ahuja's treating source opinion "some weight" in his analysis for the reason that it is generally consistent with the weight of the objective evidence of record and Dr. Ahuja's own treatment records (Docket No. 11, p. 24 of 568). Dr. Ahuja's treatment records are cited throughout ALJ Beekman's RFC analysis and summary of the medical evidence including her findings from May through August 2012, November 2012 and February 2013 (Docket No. 11, p. 22 of 568). Based on ALJ Beekman's decision, it is apparent that the only opinion of Dr. Ahuja's that was discounted was the standing limitation assessed in her June 13, 2012 letter (Docket No. 11, p. 22 of 568). To support his finding, ALJ Beekman reasoned that Dr. Ahuja's assessment of the standing limitation was rendered only one month after she first treated Plaintiff and was otherwise unsupported by any reasons (Docket No. 11, p. 24 of 568). By highlighting Dr. Ahuja's limited treating relationship with Plaintiff at the time she rendered the standing limitation and the lack of support offered for her findings, ALJ Beekman's rationale for discounting Dr.

18

Ahuja's opinion quickly arrives at the crux of 20 C.F.R. § 416.927(c)(2). That regulation provides that the Commissioner will give a treating source's opinion concerning the nature and severity of an impairment controlling weight, if the Commissioner finds the opinion *well-supported* by medically acceptable clinical and laboratory diagnostic techniques *and* it is *not inconsistent* with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2) (West 2014)(emphasis added). ALJ Beekman's summation of the medical record clearly demonstrates that the standing limitation assessed by Dr. Ahuja is neither well-supported by objective medical evidence nor consistent with the other substantial evidence in the case record.

In reviewing  Dr. Ahuja's treatment records from July and August 2012, ALJ Beekman observed that Plaintiff first sought treatment for his foot ulcer in July 2012, which had improved by August 2012, and occurred during a time in which Plaintiff's diabetes was not in good control (Docket No. 11, p. 22 of 568). While ALJ Beekman does not expressly accentuate the relationship between Plaintiff's ulcer and the status of his diabetes, the ALJ's summary of the medical evidence underscores two important points. First, the record reflects only one instance in which Plaintiff experienced a foot ulcer, which was successfully treated and second, the ulcer developed during a time in which Plaintiff's diabetes and blood pressure were both uncontrolled as a result of Plaintiff's failures to take his medications, maintain his diet and eat consistent meals (Docket No. 11, pp. 22-23; 546; 555; 308-309; 367-371; 381-384; 496-502; 338-356; 449-453; 464-474 of 568). Furthermore, Plaintiff's treatment records indicate that his working conditions at the time he developed his foot ulcer required him to stand eight hours a day (Docket No. 11, p. 399 of 568).

The regulations require an ALJ to consider all of the medical and other relevant evidence of a claimant's impairments and symptoms to determine the extent they affect a claimant's capabilities in a work setting. 20 C.F.R. § 416.945 (West 2014). The responsibility of assessing the claimant's RFC at the administrative hearing level belongs to the ALJ. *See* 20 C.F.R. § 416.946(c) (West 2014). While medical opinions concerning a Plaintiff's limitations are considered by the ALJ in his RFC analysis, they are not dispositive of issues reserved

19

to the Commissioner. *See* 20 C.F.R. § 416.927(d) (West 2014). The Commissioner's RFC findings are not subject to reversal so long as they are supported by substantial evidence. *See Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 911 (N.D. Ohio 2008)(citation omitted). ALJ Beekman's RFC assessment for Plaintiff expressly accounts for his uncontrolled diabetes and blood pressure, restricting Plaintiff to standing and walking no more than four hours a day and one hour at a time (Docket No. 11, p. 24 of 568).

Given Dr. Ahuja's limited treatment of Plaintiff at the time she rendered her opinion concerning his ability to stand and the lack of support given for the assessed limitation, the undersigned Magistrate finds the ALJ's determination to discount Dr. Ahuja's opinion is supported by substantial evidence.

## 2. IS THE ALJ'S DETERMINATION THAT PLAINTIFF IS CAPABLE OF PERFORMING LIGHT WORK SUPPORTED BY SUBSTANTIAL EVIDENCE.

In his second assignment of error, Plaintiff alleges that the ALJ's finding that Plaintiff can perform a limited range of light work, perform some of his past relevant work, and is not disabled is not supported by substantial evidence (Docket No. 15, pp. 11-13 of 15). Plaintiff argues that at most, he is able to perform sedentary work with restrictions, which under the medical vocational guidelines would result in a disability finding (Docket No. 15, pp. 11-13 of 15). Defendant responds and contends that the ALJ's findings concerning the opinions of Dr. Ahuja and Dr. Pahlajani are supported by substantial evidence and consistent with the rest of the evidence of record (Docket No. 16, pp. 12-13 of 15).

Plaintiff alleges that the ALJ overlooked the actual work functions when he found Plaintiff capable of the work assessed in his decision (Docket No. 15, pp. 11-12 of 15). Citing the walking and standing requirements necessary to perform a full range of light and sedentary work, Plaintiff argues that he is clearly limited to sedentary work (Docket No. 15, p. 12 of 15). To the extent that Plaintiff's argument relies upon Dr. Ahuja's opinion that Plaintiff cannot stand for long periods of time and no more than two hours, the argument must fail for the reasons previously outlined in the preceding section. Instead, the Court focuses on Plaintiff's allegations

20

concerning ALJ Beekman's step-five findings, specifically that the ALJ overlooked the work functions for the representative occupations he assessed (Docket No. 15, p. 11 of 15).

At step-five, the burden of proof shifts to the ALJ to identify jobs in the national economy that accommodate the claimant's RFC and vocational profile. *Wilson*, 378 F.3d at 548 (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *Jones*, 336 F.3d at 474). To accomplish this, the ALJ can apply the medical-vocational grid found in 20 C.F.R. Pt. 404, Subpt. P, App 2, which uses a claimant's age, education, and whether the claimant has transferable work skills to direct a conclusion of whether or not he is "disabled" or "not disabled." *Id.* (citing *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003); *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990)). If a claimant suffers from a limitation which the grid does not account for, the ALJ "may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Id.* (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 537-38 (6th Cir. 2001); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996)). The Sixth Circuit has repeatedly held "that the testimony of a vocational expert concerning specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work." *Id.* at 549 (citing *Wright*, 321 F.3d at 616; *Cline*, 96 F.3d at 150; *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir. 1988)).

ALJ Beekman's decision clearly reflects his consideration of Plaintiff's age, education, past work experience, and RFC in his hypothetical questions to the VE (Docket No. 11, pp. 25-26 of 568). In determining whether Plaintiff is able to perform his past relevant work, ALJ Beekman indicated that he relied upon the VE's testimony that Plaintiff is capable of his past work as security guard and police officer II (Docket No. 11, p. 25 of 568). When addressing the issue of whether Plaintiff is capable of performing other work existing in significant numbers in the national and regional economy, ALJ Beekman detailed his consideration of the

Medical-Vocational guidelines, Medial Vocational Rule 202.21, and his reliance on the VE (Docket No. 11, p. 26 of 568).  In response to questions concerning a hypothetical person of the same age, education, past work experience and RFC as Plaintiff, the VE testified that such an individual would be capable of performing other work including the representative occupations of office helper, mail clerk, and cashier II (Docket No. 11, p. 26 of 568).  For both Plaintiff's past relevant work and other work, ALJ Beekman found them consistent with the DOT and its companion volume, *Selected Characteristics of Occupation* (Docket No. 11, p. 26 of 568).

For these reasons the undersigned Magistrate finds the ALJ's step-five findings supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   August 7, 2014